UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                         :
WILHELMINA "MINA" MONTGOMERY,       :
                                                         :
                                    Plaintiff,           :
                                                         :
              - against -                                :
                                                         :
AGNIESZKA HOLLAND, *et al.*,                :
                                                         :
                                    Defendants.   :
                                                         :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/30/2019___

17-CV-3489 (VSB)

**OPINION & ORDER**

Appearances:

Wilhelmina "Mina" Montgomery
New York, NY
*Pro se Plaintiff*

Tom J. Ferber
Ross McClintic Bagley
Pryor Cashman LLP
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Pro se Plaintiff Wilhelmina "Mina" Montgomery brings this copyright infringement action against twenty (20) Defendants involved in the production of a mini-series entitled *Rosemary's Baby* ("the Miniseries"), which Plaintiff alleges infringes her copyright in two unpublished short stories. Before me is Defendants' motion for judgment on the pleadings pursuant to Rule 12(c) and Defendant Cinestar Pictures, LLC's motion to dismiss pursuant to Rule 12(b)(6). Because I find that the Miniseries is not substantially similar to Plaintiff's works as a matter of law, Defendants' motions are GRANTED.

# I.    <u>Background</u>[1]

Plaintiff alleges she is the author of two copyrighted short stories, entitled "Drowning Paris in Mississippi Tears OR The Groaning Road – The True Story," (the "True Story"), and "Drowning Paris in Mississippi Tears OR The Groaning Road – The Fictionalized Story," (the "Fictionalized Story," and together, "the Short Stories").  (Am. Compl., Doc. 9 at  6.)[2]  She alleges that in 2012, she e-mailed copies of these stories to Agnieszka Holland, a director and an acquaintance of Plaintiff, who responded by email to her, complimenting and critiquing the stories.  (*Id.* at 6, 20–25.)  Holland directed a miniseries entitled *Rosemary's Baby* ("the Miniseries").  (*Id.* at 26.)  The other Defendants are scriptwriters and producers of the Miniseries.  (*Id.*, Doc. 9 at 2–18.)

Plaintiff alleges that the Miniseries is "largely based on [her] two short stories," which she attaches to her Complaint.  (*Id.*, Doc. 9 at 6; Doc. 9-1 at 64– 66, Doc. 9-2 at 1–26.)  She asserts that "many of the characters, the setting, the storyline, the timeline, exact dates, verbatim dialogue and dialogue developed by the Plaintiff" inspired the same elements of the Miniseries, (*id.*, Doc. 9 at 7), and details these alleged similarities (or, as she refers to them, "resemblances") in her complaint, (*id.* at 26–73; Doc. 9-1 at 1–63).

---

[1] The facts set forth herein are taken from the allegations contained in the Amended Complaint.  (Doc. 9.)  I assume Plaintiff's allegations contained in the Amended Complaint to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Am. Compl." refers to Plaintiff's Amended Complaint, filed on November 7, 2017.  (Doc. 9.)  The Amended Complaint is spread over three ECF documents, Docs. 9, 9-1 and 9-2.  Therefore, for ease of reference, all citations to the Amended Complaint include the ECF document number and the page number within that document.

## II. **Procedural History**

Plaintiff filed her Complaint on May 9, 2017. (Doc. 1.) On August 29, 2017, Plaintiff requested a 90-day extension of time to effect service. (Doc. 5.) On August 31, 2017, I issued an Order of Service that granted this request and directed the Clerk of Court to send Plaintiff the forms needed to effect service on Defendants through the United States Marshals Service. (Doc. 6.)

Plaintiff indicated that she misunderstood this Order in a letter dated October 17, 2017, (Doc. 8), and filed an Amended Complaint on November 7, 2017, (Doc. 9). The Amended Complaint named the following nineteen (19) Defendants: Agnieszka Holland ("Holland"), Scott Abbott ("Abbott"), James Wong ("Wong"), David A. Stern ("Stern"), Robert Bernacchi ("Bernacchi"), Cisely Saldana, Mariel Saldana, Zoe Saldana, Alixandre Witlin ("Witlin"), Joshua D. Maurer ("Maurer"), Tom Patricia ("Patricia"), Lions Gate Entertainment Corporation ("Lions Gate Entertainment"), NBC Television ("NBC"), City Entertainment ("City"), Kippster Entertainment ("Kippster"), Liaison Films ("Liaison"), Cinestar Pictures ("Cinestar"), Federation Entertainment ("Federation"), and Netflix Entertainment Company ("Netflix"). (*Id.*) Accordingly, on November 13, 2017, I entered an Amended Order of Service and vacated my August 31, 2017 Order of Service. (Doc. 10.)

From November 2017 through February 2018, the United States Marshals Service made service upon Netflix, City, Wong, Abbott, Zoe Saldana, Mariel Saldana, Bernacchi, and NBC Television. (*See* Docs. 15, 17, 18, 19, 21, 22, 23, 33.) The U.S. Marshals Service reported it was unable to serve Defendant Liaison Films because the address of service was outside the country, and service was returned unexecuted as to Cisely Saldana, Cinestar, Lionsgate Entertainment, Tom Patricia, Federation, Kippster, and David A. Stern. (*See* Docs. 12, 13, 14,

16, 20, 32, 34.)

At Plaintiff's request, (Doc. 29), I granted a 90-day extension of time to serve the Defendants with the assistance of the U.S. Marshals Service.  (Doc. 31.)  I also granted Plaintiff leave to file a Second Amended Complaint naming Lions Gate Television as a Defendant.

On March 6, 2018, an Answer was filed by Defendants Abbott, Bernacchi, City, Kippster, Lions Gate Entertainment, Maurer, NBC, Netflix, Mariel Saldana, Zoe Saldana, Witlin, and Wong ("Lions Gate Defendants").  (Doc. 39.)  Those Defendants then filed the instant motion for judgment on the pleadings under rule 12(c) on March 22, 2018, (Doc. 42), along with a memorandum of law in support, (Doc. 43).  Plaintiff submitted two letters opposing Defendants' motion, stating that she intended to file a Second Amended Complaint by April 30, 2018, and requesting an extension of time to submit a formal memorandum in opposition to Defendants' motion.  (*See* Docs. 45, 46.)  Defendants submitted a letter indicating that they did not object to an extension but opposed Plaintiff's request to file a Second Amended Complaint. (Doc. 47.)

Plaintiff filed her Second Amended Complaint on April 18, 2018, naming Lionsgate Television as well as including nearly one hundred pages of additional material.  (Doc. 51.)  She then filed her memorandum of law in opposition to Defendants' motion on April 19, 2018. (Doc. 50.)  Defendants filed their reply memorandum on April 30, 2018.  (Doc. 53.)

On June 11, 2018, I issued an Order directing Plaintiff to provide the Court with proper addresses for those Defendants who had not yet been served.  (Doc. 68.)  Plaintiff provided a list of Defendants with addresses of service on June 26, 2018.  (Doc. 70.)  On June 2, 2019, I issued an order striking the Second Amended Complaint from the record because "Plaintiff had failed to follow my instructions to only name Lionsgate [sic] Television as a Defendant in is matter."

(Doc. 76.)  In addition, because Plaintiff had failed to provide the Court with service information for certain Defendants despite three opportunities to do so, I dismissed the following Defendants from the action:  Holland, Stern, Cicely Saldana, Patricia, Federation, Lions Gate Television, and Kasia Adamik; Lionsgate Television and Adamik were named only in Plaintiff's Second Amended Complaint.  (*Id.*)  I gave Plaintiff three months to serve Liaison Films, a foreign entity, through the Hague Service Convention or the appropriate international means of service.  (*Id.*)  On the same date, I issued an Amended Order of Service as to Cinestar Pictures at one of the addresses provided by Plaintiff in Doc. 70.  (Doc. 75.)  Service was returned unexecuted, (Doc. 78), and I issued another Order of Service as to Cinestar Pictures at a different address previously provided by Plaintiff, (Doc. 79), and on July 23, 2019, service was made upon Cinestar.  (*See* Doc. 81).  On July 23, 2019, Cinestar filed a motion to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6), (Doc. 80), along with an affidavit of service stating that it served the motion on Plaintiff on that day, (Doc. 81).  Cinestar did not file a memorandum of law but incorporated the arguments made in the motion for judgment on the pleadings and memorandum of law in support filed by the other defendants.  (*Id.*)

In letters dated August 10, 2019 and August 22, 2019, Plaintiff sought an extension of time to serve Liaison on the basis that she had not yet received confirmation of service of the summons.  (Docs. 84, 86.)  On August 28, 2019, I issued an order granting an extension of time to serve Liaison until September 30, 2019.  (Doc. 85.)  In a letter dated September 24, 2019, Plaintiff sought leave for an additional extension of time to serve Liaison until November 30, 2019.  (Doc. 88.)  In the same letter, Plaintiff informed that that she did not receive Cinestar's motion to dismiss until September 19, 2019, and reiterated her request that her First Amended Complaint not be dismissed.

## III.   <u>Legal Standards</u>

### A.   *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

### B. *Rule 12(c)*

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, a district court must "employ the same standard applicable to Rule 12(b)(6) motions to dismiss." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015). This means "[a]ccepting the non-moving party's allegations as true and viewing the facts in the light most favorable to that party," and granting judgment on the pleadings "if the moving party is entitled to judgment as a matter of law." *Richards v. Select Ins. Co.*, 40 F. Supp. 2d 163, 165 (S.D.N.Y. 1999) (internal quotation marks omitted).

Under Rule 12(c), a party is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (internal quotation marks omitted); *see Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (noting that judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings"); 5C Charles Alan Wright et al., Fed. Prac. & Proc. § 1368, at 251 (3d ed. 2004) (noting that "plaintiff may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery"). "On a [Rule] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L-7 Designs*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).

### C.     *Pro Se Litigant*

Even after *Twombly* and *Iqbal,* a "document filed *pro se* is to be liberally construed and

. . . must be held to less stringent standards than formal pleadings drafted by lawyers." *Bennett*

*v. City of New York,* 425 F. App'x 79, 80 (2d Cir. 2011) (summary order) (quoting *Boykin v.*

*KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008)).  Further, pleadings of a pro se party should be read

"to raise the strongest arguments that they suggest."  *Kevilly v. New York*, 410 F. App'x 371, 374

(2d Cir. 2010) (summary order) (internal quotation marks omitted).  Nevertheless, dismissal of a

pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by

more than conclusory factual allegations.  *See Walker v. Schult*, 717 F.3d 119, 124, 130 (2d Cir.

2013).  In other words, the "duty to liberally construe a plaintiff's complaint is not the equivalent

of a duty to re-write it."  *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y.

2009) (internal quotation marks omitted).

### IV.     <u>Discussion</u>

For the purposes of their motion, Defendants do not dispute that Plaintiff has a copyright

over the Short Stories.  (Defs.' Mem. 3 n.3.)[3]  They argue, however, that the Short Stories are not

substantially similar to the Miniseries as a matter of law and so Plaintiff's copyright infringement

claim must fail.  (*Id.*; *id.* at 5.)

### A.     *Applicable Law*

"To prevail on a claim of copyright infringement, a plaintiff must demonstrate both (1)

ownership of a valid copyright and (2) infringement of the copyright by the defendant."  *Yurman*

*Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108–09 (2d Cir. 2001).  Infringement, in turn, requires a

---

[3] "Defs.' Mem." refers to the Memorandum of Law in Support of Motion for Judgment on the Pleadings filed on March 22, 2018 by all remaining Defendants, except Cinestar Pictures and Liaison Films.  (Doc. 44.)

plaintiff to demonstrate both that: "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's [work]." *Id.* at 110 (internal quotation marks and emphasis added). Put differently, a work that "closely resembles" a copyrighted work will not infringe that work where the "similarity is . . . not the result of copying." *Id.* (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–46 (1991).

Only "the expression of ideas" is protected, "not the ideas themselves." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 67 (2d Cir. 2010). To determine whether two works share a substantial similarity of expression, the standard test "is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Id.* at 66 (internal quotation marks omitted). Where a work contains both protectable and unprotectable elements, however, the analysis must be "more discerning." *Id.* (citation omitted). Put differently, a court, "confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134–35 (2d Cir. 2003).

Courts have developed a number of general principles to identify the elements of a work that are "free for the taking" and therefore not protectable. *See id.* Some of these principles include:

- "[W]hen there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression." *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 707–08 (2d Cir. 1992) (citation omitted) (setting forth the "merger doctrine").

- Copyright protection does not extend to "*scenes a faire*," or devices, elements, or sequences of events that "necessarily result from the choice of a setting or situation." *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir. 1996) (internal quotation marks omitted); *see also MyWebGrocer, LLC v. Hometown Info, Inc.,* 375 F.3d 190, 194 (2d Cir. 2004) (*scenes a faire* are "unprotectible elements that follow naturally from a work's theme rather than from an author's creativity").

- Material found in the public domain is not protectible. *Comput. Assocs. Int'l*, 982 F.2d at 707.

- Stock characters and basic character types are not entitled to copyright. *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999).

- "[W]ords, short phrases, titles, and slogans are not subject to copyright," although copying of a phrase may be actionable "if the phrase amounts to a sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity, or if the copier has quoted or paraphrased a sequence of creative expression that includes an ordinary phrase." *Lewinson v. Henry Holt & Co.*, 659 F. Supp. 2d 547, 568 (S.D.N.Y. 2009) (internal quotation marks omitted) (collecting cases).

Still, "even a compilation of unprotectable elements may enjoy copyright protection when those elements are arranged in an original manner." *Hogan*, 48 F. Supp. 2d at 309. Ultimately, then, the court's inquiry "focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged' the elements of his or her work." *Gaito*, 602 F.3d at 66. Merely listing "random similarities scattered throughout the works" cannot, on its own, support a finding of substantial similarity "because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590 (internal quotation marks omitted). Instead, the court's analysis should be principally guided by a comparison of the "total concept and overall feel" of both works, *Gaito* 602 F.3d at 67 (citation omitted), as well as an examination of "similarities in the theme, setting, characters, time sequence, plot, and pace." *Williams*, 84 F.3d at 589. However, where two works differ in genre

and medium, it is also appropriate to assess whether the quantitative and qualitative similarities between the works are more than *de minimis*.  *Castle Rock Entm't, Inc. v. Carol Pub'g Grp., Inc.*, 150 F.3d 132, 138–39 (2d Cir. 1998).

"Though the issue of substantial similarity is frequently a fact issue for jury resolution," *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 239 (2d Cir. 1983), the Second Circuit has "held that the issue can be decided as a matter of law, even at the pleading stage, by examining the four corners of the complaint together with the works themselves when 'no reasonable jury, properly instructed, could find that the two works' are strikingly similar." *Wager v. Littell*, 549 F. App'x 32, 34 (2d Cir. 2014) (summary order) (quoting *Gaito*, 602 F.3d at 63–64).  In other words, "no discovery or fact-finding is typically necessary, because what is required is only a . . . comparison of the works." *Gaito*, 602 F.3d at 64 (internal quotation marks omitted) (affirming district court's dismissal of copyright action under Rule 12(b)(6) for lack of substantial similarity between two architectural proposals).  On such a comparison, "the works themselves supersede and control . . . any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Id.* (internal quotation marks omitted); *see also Lombardo v. Dr. Seuss Enters., L.P.*, 279 F. Supp. 3d 497, 504 (S.D.N.Y. 2017) ("Numerous courts in this district have resolved the issue of fair use on a motion for judgment on the pleadings by conducting a side-by-side comparison of the works at issue."), *aff'd*, 729 F. App'x 131 (2d Cir. 2018).

### B.    *Application*

#### 1.  **Materials Considered**

Plaintiff attached to her Complaint a copy of the True Story, (Am. Compl., Doc. 9-1 at 64–66; 9-2 at 1–9), and the Fictionalized Story, (Am. Compl., Doc. 9-2 at 10–26).  She argues that the Miniseries copies both stories, and sets forth, in detail, the alleged "resemblances."  (*See*

*id.*, Docs. 9, 9-1.)  Plaintiff mentions in passing three antecedent works to the Miniseries—the original *Rosemary's Baby* film, the original *Rosemary's Baby* novel by Ira Levin, and the follow-up novel by Ira Levin entitled *Son of Rosemary*—suggesting that changes to the Miniseries from the originals were inspired by her own work.  (Am. Compl., Doc. 9 at 73; Doc. 9-1 at 59–60.)

The Lions Gate Defendants attach to their Answer photocopies of the copyrighted versions of both Short Stories, (Ans. Exs. B, C.),[4] which they observe differ slightly from the versions attached by Plaintiff to the Amended Complaint.  (Defendants' version of the Fictionalized Story, for example, contains an additional page of material, while Plaintiff's version cuts off abruptly.  (*Compare* Ans. Ex. C, *with* Am. Compl., Doc. 9-2 at 10–26.))  They also include a Blu-Ray disc of the Miniseries, (Ans. Ex. A), along with a synopsis of the Miniseries, (Ans. Ex. F).  The Lions Gate Defendants also allege that the Miniseries was based on Ira Levin's 1967 novel *Rosemary's Baby* (the "Novel"), which was previously adapted into a 1968 film with the same title (the "Film"), and annex a copy of the Novel, DVD of the Film, and synopsis of the Film.  (Ans. ¶¶ 6, 7; *id.* Exs. D, E, G.)  In their memorandum of law, the Lionsgate Defendants argue that "[w]hile the Miniseries makes some minor alterations . . . the basic story is unmistakably the same" as the Novel and the Film.  (Defs.' Mem. 1.)  Plaintiff's claims of copying, they contend, "ignor[e] the express and unmistakable lineage of the Miniseries."  (*Id.*)

Here, I consider the versions of the Short Stories supplied by Plaintiff, in the interest of accepting her allegations as true and drawing all inferences in her favor.  *See Kassner*, 496 F.3d at 237.  However, I note that I have reviewed the versions of the Short Stories supplied by Plaintiff and Defendants, and find that there are no material differences between the two.

---

[4] "Ans." refers to Lions Gate Defendants' Answer, filed on March 6, 2018.  (Doc. 39.)

Therefore, consideration of Defendants' versions would not change the analysis or my ultimate conclusion.

In addition, it is my view that substantive consideration of the Novel and the Film and their relation to the Miniseries is irrelevant to the Defendants' motion and inappropriate at this juncture. While on a Rule 12(c) motion, I must consider "the complaint, the answer, [and] any written documents attached to them," *L-7 Designs*, 647 F.3d at 422 (citation omitted), I must also "[a]ccept[] the non-moving party's allegations as true and view[] the facts in the light most favorable to that party," *Richards*, 40 F. Supp. 2d at 165.

Therefore, although I may consider the Novel and Film, Defendants do not cite any authority that would allow me to accept their allegations about the relation between the Miniseries and the alleged antecedent works as true at this stage. I read Defendants' references to the "the express and unmistakable lineage of the Miniseries," as an argument that if any elements of the Miniseries are, in fact, similar to protectable elements of the Short Stories, these elements owe their existence to the Film or the Novel. But this argument goes not to substantial similarity—the inquiry the Second Circuit has deemed appropriate for resolution on Rule 12 motion, *Gaito*, 602 F.3d at 64—but rather to whether that similarity is "fortuitous" and "not the result of copying," *Yurman*, 262 F.3d at 110 (citation omitted). In other words, it goes to the "actual copying" element of an infringement claim. *See Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 444 (S.D.N.Y. 2011) (granting motion for summary judgment and observing that where prior horror franchises served as independent sources of a film, no inference of copying could be drawn as to "element[s] occur[ring] both in the defendant's prior work and the plaintiff's prior work"), *aff'd sub nom. Muller v. Anderson*, 501 F. App'x 81 (2d Cir. 2012). The question of actual copying would be an issue of fact that could not be resolved

on the pleadings alone, given the allegations presently before me.  *Cf. Webb v. Stallone*, 910 F.

Supp. 2d 681, 685 (S.D.N.Y. 2012) (on defendants' motion for summary judgment, their

declaration that their film was based in part on a script for another film that was written prior to

the plaintiff's work was not sufficient to carry their burden of "strong, convincing, and

persuasive evidence" such that no reasonable jury could reach a conclusion other than that the

film had been created independently of plaintiff's work (citation omitted)), *aff'd on other*

*grounds*, 555 F. App'x 31 (2d Cir. 2014).

 In any event, Defendants do not contend that Plaintiff has failed to sufficiently allege

actual copying.  Instead, they assume for the purposes of the motion that they had access to the

Short Stories—one way in which a plaintiff may circumstantially establish copying, *see*

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003)—but argue that "all the access

in the world would not make Plaintiff's copyright infringement claim sustainable" because

ultimately the works are not substantially similar.  (Defs.' Mem. 4 n.3.)  Therefore, because 1)

Defendants have not put actual copying in issue, and 2) because in the absence of an argument

that Plaintiff has failed to state a claim as to actual copying, actual copying is a question of fact

not appropriate for resolution by judgment on the pleadings, I do not consider the relation

between the Miniseries and the antecedent works.  Instead, I limit my analysis to the question of

whether, on the face of the works, the Miniseries is substantially similar to the Short Stories.  I

find that it is not.

## 2.  The Works

 A determination of substantial similarity "requires a detailed examination of the works

themselves," and so I begin by "summarize[ing] each work at issue," *Williams*, 84 F.3d at 583

(internal quotation marks omitted), based on my "good eyes and common sense," *Allen v.*

*Scholastic Inc.*, 739 F. Supp. 2d 642, 660 (S.D.N.Y. 2011) (quoting *Gaito*, 602 F.3d at 66).

a. <u>The Groaning Road: The True Story</u>

The True Story, a 12-page short story set in Paris during the 1980s, chronicles an unnamed female narrator's friendship with a man called G until his unexplained, eerie disappearance. (*See generally* True Story.)[5]

The story opens with vignettes of the pair's friendship. (*Id.* at 1.) The narrator describes taking evening walks through different Paris neighborhoods, with G stopping to dig through garbage piles, in search of valuables. (*Id.*) The narrator describes G as an "intelligent, talented, cultivated black man" with "an artistic nature" from Texas. (*Id.* at 2.) A former civil servant, G retired and settled in Paris. (*Id.*) The narrator is intrigued by G's "generosity with companionship and his stinginess with money, his cheerful outlook and resigned acceptance of human nature." (*Id.*) According to the narrator, G is gay, although this is not something G spoke about explicitly. (*Id.*)

The narrator and G visit museums and discuss the works they see, share meals, attend jazz concerts, and socialize. (*Id.*) At one event, the two encounter an American expatriate, George Brown, a drummer from Flint, Michigan. (*Id.*) George grew up with church music and eventually played for Motown. (*Id.*) He teases G about being gay but the narrator explains that underneath the teasing, George and G bonded over their shared musical heritage. (*Id.*) The narrator confesses that she wants George to drop his groupies and fall in love with her, but knowing this is unlikely, settles for flirting with him instead. (*Id.* at 3.)

---

[5] "True Story" refers to "Drowning Paris in Mississippi Tears or The Groaning Road The True Story," included in Plaintiff's Amended Complaint, filed on November 7, 2017. The True Story is spread across two of the ECF documents that comprise Plaintiff's Amended Complaint: Document 9-1, at 64–66, and Document 9-2 at 1–9. The pages are also internally numbered; i.e. Document 9-1 contains pages 1–3 of the True Story, and Document 9-2 contains pages 4–12 of the story. For ease of reference, I refer in this summary to the internal numbers rather than the ECF numbers.

The narrator tells us that she and G went out "on the town" two or three times a week, visiting smoke-filled Paris clubs to "experience[] over and over the genius and downright craziness of a tight-knit musical family in exile." (*Id.*) It was after these nights out that G and the narrator would go walking through Paris. (*Id.*)

One day, the narrator says, she and G began talking about the Christian church. (*Id.*) The narrator comments that the American Church in Paris is full of "evil people," and G argues that the church's objectives have "nothing to do with God" but rather with the domination of others. (*Id.* at 4.) The narrator becomes defensive, but then makes a self-deprecating joke and lets G win the argument. (*Id.*) Privately, she tells the reader that she had never left the black church of her upbringing behind, where she found "joy and power and love." (*Id.*) In contrast, she describes feeling like an outsider at white churches. (*Id.*) G, on the other hand, had lost "[h]is inherited bigotry of white people" and was open and engaging with all types of people, despite the "horror stories of Texas and Mississippi" from his past. (*Id.* at 5) With these qualities, G influenced the narrator to accept those different from her. (*Id.*)

The narrator then returns to describing their walks, alluding to "charming," "timeless" neighborhoods, "hidden courtyard[s]" with "medieval brick floors" and "cracked, gray walls covered with vines," and describing how they crossed the Seine daily, "marvel[ing] at the . . . stately bridges." (*Id.* at 5–6.) The narrator then becomes introspective again, musing about time, the fleeting nature of life, and the presence of the past in Paris. (*Id.* at 6.)

The scene shifts to a party at the narrator's home. (*Id.*) G is singing to the admiring guests and George arrives drunk with two groupies in tow. (*Id.* at 7.) She wonders aloud to G whether their friends are so admiring because singing "assures people that we've forgotten the past," implying that "we" refers to their shared racial heritage. (*Id.*) G tells her to stop it and to

sing only for herself.  (*Id.*)

After the party, the narrator and G are alone cleaning up.  (*Id.*)  G announces that he has found his own apartment and invites the narrator to come to dinner the next day.  (*Id.*)  The narrator is surprised and pleased to hear that G has splurged to rent his own place after living with other people, but G explains that he has rented a room in someone else's apartment.  (*Id.*)

The next day, the narrator arrives at G's new apartment on time and rings the bell.  (*Id.* at 8)  G opens the door and escorts her into a "spacious living room with high ceilings."  (*Id.*)  The carpet, a sofa, and an armchair are all gray; there is no other furniture in the room.  (*Id.*)  A black and white portrait of Hitler is hung on the wall above the sofa.  (*Id.*)  The portrait stuns the narrator into silence.  (*Id.*)  She is about to say something to G when a short, elderly couple appears behind her.  (*Id.* at 9.)  The narrator greets them with a "bonjour," but they only nod.  (*Id.*)  G gives her a tour of his area of the apartment, while the narrator tries to ask him using mime why he has chosen to live with Nazis.  (*Id.*)  She is afraid to ask him out loud, for fear the couple will overhear.  (*Id.*)

In the kitchen, the narrator encounters other abnormalities:  a bushel and a half of garlic sits on the counter, and the cabinets are completely empty.  (*Id.* at 10.)  She becomes aware of a strange, piercing smell that she cannot identify.  (*Id.* at 11.)  G begins preparing dinner, then sets the table, and the friends sit down to eat; the food is delicious.  (*Id.*)  Still feeling strange, the narrator leaves earlier than she ordinarily would, and tells G she will call the next day.  (*Id.*)

But when she telephones, G does not answer.  (*Id.*)  The narrator calls him every day for weeks, knocks on the door once, and stands outside looking up at the apartment window, but G never reappears.  (*Id.*)  She never sees or hears from him again.  When the narrator retells this story to others, they ask why she doesn't go to the police.  (*Id.* at 12.)  What happened was so

impossible for her to accept, she explains, that she had blocked the story and G's existence from her conscious mind.  (*Id.*)

b.  <u>The Groaning Road:  The Fictionalized Story</u>

The Fictionalized Story is a 17-page work labeled "a synopsis."  (Fic. Story 1.)[6]  Narrated in the third person, it opens on a brown-skinned woman called Tracey Pryor, who is visiting a church annex and notices a young man watching her from among the dwindling crowd.  (*Id.*)  They lock gazes until she looks away, embarrassed.  (*Id.*)  Tracey leaves the annex and walks down a boulevard through a series of chic neighborhoods; she has already explored them aimlessly, looking for a street that she has not had the nerve to locate definitively.  (*Id.*)  She has a cracked postcard in her pocket.  (*Id.* at 2.)

Tracey stops into a café, and asks the barman in French whether he speaks English: "Parlez-vous anglais, Monsieur?" she says.  (*Id.*)  The barman says he does, and the two chat briefly.  (*Id.* at 2–3.)  Tracey shows him the postcard and asks whether he knows the street written on the back.  (*Id.* at 3.)  Her father used to live there, a long time ago, she says.  (*Id.*)

The story then cuts away from Tracey.  (*Id.*)  Two women in their late forties meet in a square near an exclusive Paris neighborhood.  (*Id.*)  One, Andrea Durand, is a blond Dutch-French Huguenot from South Africa.  (*Id.*)  The other, Jerri Miles, is an African American from Mississippi.  (*Id.*)  They greet each other fondly like old friends and begin walking.  (*Id.* at 3–4.)

Andrea and Jerri have been friends for nearly a quarter century.  (*Id.* at 4)  Andrea is kind, intelligent, and wealthy; Jerri is intelligent and observant, with a "sparkling smile and honey-coated voice."  (*Id.*)  However, she makes "biting analyses" and has a tendency to go

---

[6] "Fic. Story" refers to "Drowning Paris in Mississippi Tears or The Groaning Road A Synopsis of the Fictionalized Story," which is included in Plaintiff's Amended Complaint, filed on November 7, 2017, Doc. 9-2 at 10–26.  The pages are also internally numbered.  For ease of reference, I refer in this summary to the internal numbers.

"straight for the jugular" when attacked. (*Id.*) Andrea says she was surprised by her friend's personality, and admits that this surprise could only have been due to stereotypes instilled deep inside her. (*Id.*) She befriended Jerri to prove she could be open-minded and to defy her parents. (*Id.*) Jerri, in turn, wanted to defy her own parents' bigotry. (*Id.* at 4–5.) She admires Andrea, but is exasperated when her friend picks expensive restaurants without considering her budget, and when her friend flirts with "Lance." (*Id.* at 5.)

The pair stroll down the busy street, arm-in-arm, a habit they had "picked up from Parisian women decades ago." (*Id.*) They do not talk much. (*Id.*) Jerri buys a newspaper, and Andrea asks whether she is "looking for new leads to pick up their trail again." (*Id.* at 6.) The two discuss someone who has disappeared; Jerri wonders about him, but Andrea tells her she can't devote her life to searching for him. (*Id.*) Andrea then suggests having a drink; Jerri agrees even though Andrea isn't supposed to drink. Andrea suggests inviting "Lance," who turns out to be Jerri's significant other and a musician, and who is also not drinking. (*Id.* at 6–7.)

Andrea and Jerri sit down at a café by the window with pâté, bread, and wine. (*Id.* at 7.) Jerri feels guilty about drinking around Andrea. (*Id.*) Andrea asks about Jerri's job at the university. (*Id.*) Jerri teaches there, but is also assisting "Professor Stern" with a research project related to what Andrea calls her "Nazi man-hunt." (*Id.* at 8.) Andrea teases her about the research project, but softens and tells Jerri she admires her and says that she has faith that if "the couple" is alive, she and the professor will bring them to justice "for what [they] believe . . . happened to Ollie." (*Id.*) Although not explicitly stated, "Ollie" seems to be the person whose disappearance Andrea and Jerri were discussing earlier in the story.

Jerri and Andrea sip wine and get progressively more drunk, and they joke with one another. (*Id.* at 9.) Andrea laments the fact that her father can no longer drive and so she has to

drive him to church for "secret meetings" where, she says, he and "his cronies" purposely speak in languages she does not understand.  (*Id.* at 9–10.)  Jerri says Andrea is paranoid.  (*Id.* at 10.)  Andrea encourages Jerri to go back to church; Jerri recalls growing up in the church and says it felt joyful and loving.  (*Id.*)  In contrast, she says, the American Assembly in Paris, a church congregation, is full of spying, hate, pedophilia, and former Nazis.  (*Id.*)  They all protect each other's secrets and make generous donations in order to protect their own, according to Jerri.  (*Id.* at 11.)  Jerri teasingly accuses Andrea of being part of this tradition; Andrea plays along and then changes the subject.  (*Id.* at 11–12.)  She had noticed a familiar-looking black woman at church that morning.  (*Id.* at 12.)  The woman had looked lost and alone, but disappeared before Andrea was able to talk to her.  (*Id.*)

The story then cuts away from Andrea and Jerri to a church annex.  (*Id.*)  A character named Damien Kleber is at his grandmother's elbow as she greets people during coffee hour when he notices a striking young woman.  (*Id.*)  Also present are Andrea and her father.  (*Id.*)  Andrea muses that she doesn't care much for other people, unlike Jerri who seeks to connect with everyone she met.  (*Id.* at 12–13.)  Andrea observes Damien looking wistful and preoccupied with the young woman.  (*Id.* at 13.)

Damien's grandmother notices the young woman's face and startles.  (*Id.* at 14.)  Damien recalls her having a similar reaction when a black friend of Andrea's had come to church several years ago.  (*Id.*)  Damien asks his grandmother if she is all right.  (*Id.*)  She says she is but that they need to leave.  (*Id.*)  The young woman disappears, and Damien hopes that it wasn't the color of her skin that had startled his grandmother.  (*Id.*)  But, he says, his grandparents had always avoided the handful of Africans who had attended their church, and the whole congregation had implicitly aimed to discourage them from coming at all.  (*Id.*)  Still, Damien

hopes to see the young woman again.  (*Id.*)

The story cuts again to Professor Stern at his desk.  (*Id.* at 15.)  Stern researches Nazis and seeks out those in hiding.  (*Id.*)  He seems to be elderly and worries about leaving his work unfinished; he is grateful for Jerri's help and energy.  (*Id.*)  Jerri had shared an "astounding story" with him and had introduced him to her musician boyfriend Lance.  (*Id.*)  Stern, a Jewish French researcher, and Lance, an African-American drummer, have much in common despite their different backgrounds.  (*Id.* 15–16.)

Stern observes that many of his colleagues are opposed to the university's opening its doors to more diverse students and professors.  (*Id.* at 16.)  He recalls a conversation in which he advised Jerri that even in 2008, Paris is not like America.  (*Id.*)  He suggests she be more discreet with her opinions.  (*Id.*)  Jerri fires back:  is intellectual curiosity only for certain people?  (*Id.*)  The two enjoy each other's frank way of talking.  (*Id.* at 17.)  As a result, even though Stern had been dismissive when Jerri first approached him, he is moved when he hears her story of a friend who had rented a room from a Nazi couple and then disappeared without a trace.  (*Id.*)  He agrees to help look for the Nazi couple, and in return Jerri offers to help him by translating and tidying his desk.  (*Id.*)  The story cuts off there.  (*Id.*)

### c.  Rosemary's Baby:  The Miniseries[7]

The Miniseries is four hours long, spread over two installments.  Part I opens on a woman, fair-skinned with dark, messy hair.  She is looking at a book with the words "Steven Marcato Servant of the Devil?" and writes "it's an anagram."  A man is banging on the door to the room but she does not let him in.  Frantic, she shouts that he betrayed her.  She holds her

---

[7] This summary was created using the synopsis of the Miniseries and by watching the entirety of the Miniseries as presented on the Blu-Ray discs provided as attachments to the Answer of the Lions Gate Defendants.

belly, saying "my baby," and steps up on the radiator in front of an open window. Just as the man forces the door open, she jumps and hits the ground outside, several stories below the window. The camera lingers on her body on the ground, limbs askew and blood pooling behind her.

The film cuts to another couple. Rosemary, a woman with medium-toned skin, is lying on an examination table while a man conducts an ultrasound of her belly. Rosemary is told that the baby she is carrying has died. Heartbroken, she and her husband, Guy, who is white, leave the office, passing a man with piercing, unnaturally blue eyes and a strange cane.

The film cuts to Rosemary and Guy unpacking their new apartment in Paris. Rosemary tries to seduce Guy, but he says he needs to work on his book. Rosemary goes out. She approaches a pair of young men and asks if they speak English – "*parlez-vous anglais?*" – and asks for directions. They speak French; she seems not to understand and giggles. She finds her way to the café she is looking for, where she meets her friend Julie. The two go walking along the Seine, arm in arm, with bridges visible in the background. Eventually, they part ways. Rosemary, walking alone, passes a baby in a carriage. When she stops to look in at the baby, a thief snatches her purse and runs away. As Rosemary chases him, he collides with a car, dropping what he's carrying, and keeps running. When Rosemary looks at the wallet he dropped, it turns out not to be hers, but rather belongs to a "Margaux Castavet."

Rosemary goes to the address listed in the wallet, an ornate building called La Chimere, and meets Margaux. Margaux is charmed by Rosemary, and invites her and Guy to a party that night. That evening, a man in a suit appears at their apartment to escort them to the party, which turns out to be formal and elaborate. Rosemary and Guy, whose last name is Woodhouse, meet Margaux's husband, Roman, who says he is familiar with Guy's work and sweeps him away to

meet other guests.  Rosemary mingles with the others in attendance at the party.  At one point, she is looking for the bathroom, but accidentally encounters the blue-eyed man from the doctor's office having sex with two women.  She does not recognize him.  At the end of the night, Roman gives the Woodhouses a black kitten.

After Rosemary and Guy have gone to bed, they are awoken by the kitten.  Guy opens the doors to the kitchen to investigate and flames burst forth.  The movie cuts to the hospital, where Rosemary is waiting on a bench.  The Castavets appear and Rosemary finds out that Guy will be released shortly.  She worries about where they will live.  The Castavets offer to let the Woodhouses live in an empty apartment they own at La Chimere, for the same rent they had already been paying.  The Woodhouses accept.  When they move into the apartment, it is fully furnished and closets are stocked with new clothes in their sizes.  Guy thinks the gesture is generous.  He finds a lacy bra and tries to persuade Rosemary to wear it.  Rosemary refuses and says that it's all too much.

Guy is not making progress on his book and is frustrated.  Rosemary dreams she jumps from the window and wakes up screaming.

Rosemary and Julie meet at the Sorbonne and walk through the hallway arm in arm. Julie says that she has recommended Guy for head of the English department.  As they are walking, Rosemary spots Roman and Guy sitting on a bench talking.  Suddenly a man comes running down the hall and knocks the books out of an older woman's hands.  Roman helps her gather the books but palms a pen she has dropped.

Rosemary returns home and panics when someone else is there.  It turns out to be Margaux and a handyman who she says is there to fix the fireplace.  Rosemary asks Margaux not to enter the apartment when they aren't home and says she has a headache from the shock.

Margaux performs some type of healing she learned in Tibet on Rosemary, then kisses her on the lips. Rosemary's headache has disappeared. After Margaux leaves, Rosemary realizes the apartment has no fireplace.

Later, Guy and Roman are riding in a car together and go to a formal gentleman's club. Roman tells him the secret to success is to find a person who makes him whole, like his wife, and a benefactor.

Back at the apartment, Rosemary is looking around trying to figure out what Margaux and the handyman had been doing there. She finds a hidden closet, which contains linens as well as a pair of baby shoes and a photograph of the couple from the opening scene. When Guy comes home, Rosemary shows him the closet and says the photo was taken from inside the apartment. Guy tells her she is obsessed. He gets ready for his interview at the English department and puts on one of the suits from the Castavets. Rosemary is upset by this. Guy tells her that his book contract has been cancelled.

Soon after, Rosemary is alone, sitting in the sun in the apartment after a shower. As she rubs lotion on, she notices a group of people in the window opposite. She hears chanting and uncanny laughter.

The scene cuts to the university. The woman who had dropped her books earlier is being interviewed. She becomes ill: sounds and voices become distorted, and she is sweating. The camera zooms in on a group of black flies, buzzing. Her nose starts bleeding; when she wipes it, the tissue comes away covered with blood and flies. She seizes a pair of scissors and stabs the interviewer, then slits her own throat. Blood spurts out. The injured interviewer staggers out of the room and Guy rushes in. He sees the woman slumped on the floor, dead and covered in blood.

Rosemary meets with the police commissioner, whom she met at the Castavets' party, and shows him the photo she found in her apartment. The commissioner informs her the couple in the photo are Jacques and Nena Pascale. Nena had killed herself and her husband was missing; the commissioner thanks Rosemary for bringing this back to his attention and tells her to always listen to her feelings.

When Rosemary arrives home, the apartment is dimly lit and rose petals are on the floor. Inside, she finds a surprise party to celebrate the fact that Guy has been appointed head of the English department. During the party, Guy pulls Rosemary aside and says he wants to try again for a baby. Margaux intuits what they are talking about and gives Rosemary a pendant to help.

That night, Rosemary has a nightmare in which Guy pushes her out of the window. She awakens to find Guy at his computer, typing furiously. He says he is working on his book.

Later, Rosemary and Julie are at a cooking class. Rosemary tells Julie about the nightmare and shows her the photograph of Nena and Jacques. Julie observes that based on the photograph, Nena was a Coptic Christian. There is only one Coptic church in Paris, she says, and suggests Rosemary go there to find people who knew Nena. Rosemary follows her suggestion and meets a priest. The priest says that Nena had been involved with Satanists and that La Chimere is an unholy place. Steven Marcato lived there, he says. In a flashback, Steven Marcato is revealed to be the man with the piercing blue eyes; the priest says he saw him rip out a woman's heart and eat it. The priest tells her that Marcato is the face of the devil, and urges her to leave town, just as he had urged Nena. Later, another priest discovers the first priest hanging from the ceiling, dead.

Rosemary reads Guy's book, which he tells her Roman is going to submit to his publisher. Rosemary catches a glimpse of the blue-eyed man in the building, but he vanishes.

At the university, Guy is walking out of a building, followed by a group of young female students. Jacques Pascale appears and approaches Guy, who recognizes him from Rosemary's photo. Jacques tells Guy there is a price for being on top. Roman is watching Guy and asks who he was speaking to; Guy brushes the question off. Roman tells Guy the publisher loved his manuscript and wants to meet. They leave together.

Rosemary meets with the police commissioner again. He tells her the Coptic priest is dead and asks why she had met with him. Rosemary tells the commissioner what the priest had told her about La Chimere. The commissioner shows her a photo of Steven Marcato, a billionaire, who she now realizes is the blue eyed man.

Back at the Castavets' apartment, Rosemary and Margaux are in the kitchen, which is full of plants and strange things, like a large jar of black fish. Margaux is butchering a black-skinned chicken and making fertility soup. When she observes that Rosemary is not wearing the pendant, Rosemary brings up Nena Pascale. Margaux breaks down: she acknowledges that she knew Nena and had begged her to leave her husband, but she did not listen.

After Guy comes home and announces that he has sold his book, the two couples go out to dinner. Rosemary wonders to Margaux why he is so aloof, and Margaux observes that success can be hard for men to accept. When they are walking home after dinner, Jacques emerges from the shadows. He shouts "No more lies! I want what I was promised!" Roman feigns confusion, and Jacques shoots him. In turn, the Castavets' driver shoots Jacques, and Margaux removes a ring from the wounded man's finger. At the hospital, Margaux is upset to hear that Jacques is not dead. As the doctors operate on Jacques' wound, the camera shows bloody close-ups of the operation and Jacques' organs. Margaux chants over the ring, camera zoomed in on her face, and the surgery begins to go awry as creepy music plays: Jacques screams and writhes on the

operating table, blood spurting from his abdomen.  He dies.  Separately, Roman is awake in his hospital bed, recovering.

Margaux and Rosemary are in the car leaving the hospital, with Guy in the front seat. Margaux says Rosemary smells "ripe"—she's ready, Margaux says.  Margaux offers to make fertility soup; Rosemary says they are all exhausted, but Margaux insists.  Back in their bedroom, Guy and Rosemary become intimate; the camera lingers on their bodies moving together in the blue-tinged shadows.  Rosemary says she feels strange, like she's floating away, and passes out. She has strange visions.  First, she first flashes back to a sunny day in her childhood.  Later, she sees Roman in the shadows, herself being kissed by Margaux, and the blue-eyed man having sex with her slumped body.  His back transforms into something monstrous-looking.  This is the end of Part I.

Part II begins the next morning.  Rosemary wakes up with bloody gouges in her back. Guy says they happened during sex, and she is upset, assuming Guy had sex with her while she was asleep.  Guy reassures her that he didn't, and shows her scratches on his own chest. Rosemary tries to seduce him again, but Guy does not want to engage.  The scene shifts to the police commissioner, who watches a security video of Jacques' death and sees a shadowed figure outside the operating room.

Rosemary meets Julie and they go walking through Paris arm in arm; the Eiffel Tower is visible in the background.  They stop to watch a capoeira performance, and Rosemary tells Julie Guy has not been interested in her since the night they had sex that resulted in the gouges on her back.  Julie's cross necklace gets caught and she asks Rosemary for help; when Rosemary touches it, her vision and hearing briefly distort.  At a tour of the Paris Catacombs, Rosemary faints.  Guy comes to meet her and she tells him that she had a sharp abdominal pain—and that

she is pregnant. Guy is happy to hear the news.

Rosemary goes to a doctor's office and tells him about the pain. The doctor confirms that she had been referred to him by the Castavets, and tells her to ask Margaux to make her a drink out of specific herbs. Guy is at a party and Roman toasts to his success.

Julie visits Rosemary and observes that she does not look well. Rosemary gets her hair cut short. Julie refers Rosemary to another doctor, who reports that the baby's heartbeat is strong but that there are some abnormalities and he wants to do more tests. When Rosemary tells Guy about this, he yells at her, disparaging the doctor as someone Julie slept with. Rosemary begins crying, but eventually agrees not to have more tests done.

Rosemary eats raw chicken and throws up. She runs into the blue-eyed man in the building again. When she reports this to the police commissioner, he tells her that Steven Marcato has not been seen in 30 years and must be dead.

Guy and the Castavets are meeting without Rosemary. He is upset; the Castavets told him Rosemary would be safe. Roman says that she is and reminds Guy that he helped write Guy's book.

Rosemary and Julie meet again. Rosemary is sick and sweating; Julie urges her to have follow-up tests, but Rosemary refuses. Julie goes to see Guy alone at the university to try to change his mind about the other doctor. Guy says he is planning to resign from his job to take care of Rosemary, and again accuses Julie of having a soft spot for the doctor because she had slept with him. Julie remarks that she has slept with Guy too, but that this does not mean she cannot discern someone's character. Guy pretends to apologize and appears to try to kiss her, but in fact steals her necklace.

Margaux brings Rosemary the herbal drink prescribed by the first doctor. Rosemary

comments that it tastes bad, but Margaux reprimands her, saying the drink is for the baby. Rosemary tells Margaux that Julie is coming by and that she is going to get an MRI.

Julie is at the cooking class alone. This scene is choppy, with strange close-ups of a fish being butchered, its guts spilling out. Julie seems confused and frantic. Suddenly, a pan of boiling liquid is upended and splashes her arm. She falls backwards, hitting her head on a countertop. She falls to the ground and twitches, eyes wide open and blood pooling behind her head. She dies. The picture cuts rapidly to a coffin being incinerated. Outside, Rosemary and Guy are dressed in black, arguing again about Rosemary's desire to see the doctor that Julie had recommended. Suddenly, Rosemary says the pain has stopped and they panic. Then, relieved, she says the baby has kicked.

Later, Rosemary's belly is much bigger. She is smiling and happy, celebrating at a baby shower thrown by the Castavets. Guy does not look happy, Roman pulls Guy aside and tells him to be more affectionate with Rosemary. They argue.

The police commissioner meets with Rosemary to tell her he has found more evidence relating to Steven Marcato. Rosemary seems to have made an about face, and tells him to stop investigating. The commissioner tells her that Nena Pascal was pregnant when she died. Guy and Rosemary celebrate New Year's Eve at home. Rosemary dreams she is in a bathtub, with someone who looks like Roman but has piercing otherworldly blue eyes rubbing her stomach.

Margaux finds Guy in a café. She kisses him on the lips.

Back at the apartment, Rosemary finds an entire hidden room. Inside, she comes upon a book called "All of Them Witches." She opens it, and sees a passage about blood sacrifice of children as well as the page about Steven Marcato pictured in the first scene of Part I. She sees where Nena Pascal had written "it's an anagram." Rosemary uses Scrabble tiles to rearrange the

letters in Steven Marcato, and discovers that they also spell "Roman Castavet." She calls the police commissioner to tell him what she has discovered. The commissioner directs Rosemary to meet him at the park. When he hangs up, we see that Roman is at his office; in a later scene, Roman tries to bribe the commissioner to stop investigating. The commissioner refuses, and Roman steals his cigarette lighter.

Guy comes home and Rosemary tells him what she has learned: that the Castavets are witches and want their baby as a sacrifice. However, when she discovers Julie's cross necklace in his desk, she realizes that Guy is involved too. Rosemary sneaks out to meet the commissioner.

As the commissioner is driving to the park, Roman casts a spell with the lighter. The commissioner begins hallucinating and experiencing distortion. He is sweating profusely and water begins pouring into the car. He repeatedly rubs his face, trying to dry it. Eventually, he rubs his face and comes away with his hand covered in blood. His face becomes increasingly bloody and he eventually stops the car in the middle of the street and stumbles out. As he to crosses the road to walk towards Rosemary, he is hit by a cement mixer. It drags his body out of frame, leaving a broad streak of blood behind it.

Rosemary goes to see the doctor referred by Julie and tells him about everything. He thinks she is hysterical and gives her a sedative. Guy and the original doctor appear to take Rosemary home; she manages to escape briefly, but they catch her. Rosemary goes into labor.

Rosemary wakes up and finds out three days have passed. Guy tells her they lost the baby because they did not make it to the hospital in time. When he tells Rosemary the body was already cremated, Rosemary screams.

Rosemary and Guy are on a boat on the Seine, silhouetted against the sunlight as they

pass under a series of bridges. She says she does not want to be with Guy and is returning to New York. They pour ashes into the river.

Back in their apartment, Rosemary hears a baby crying and starts desperately searching for the source. Milk spots appear on the front of her shirt. She walks through the hidden closet into the Castavets' apartment and picks up a knife in the kitchen. She walks further in and sees people gathered around a bassinet draped in red fabric. Guy tries to explain himself to her, and she shouts that she will not let them sacrifice her baby. She approaches the bassinet and looks in—the baby is beautiful, she says. Suddenly, his eyes glow an otherworldly blue. Roman tells her that Satan is the baby's father. Rosemary brandishes the knife as if to kill the baby, but finds she cannot. Instead, she picks him up and cradles him, then brings him to her breast to nurse. The people gathered around say "Hail Rosemary."

Later, Rosemary is walking along the Seine, pushing a baby carriage on the cobblestones. A woman peeks in and comments on how beautiful the baby is. "I know," says Rosemary. "He's perfect."

### 3. Comparison of the Works

The works undisputedly bear a handful of superficial and immaterial similarities, such as the ethnicities of certain characters and the Parisian setting. However, having examined the relevant works in detail, it is apparent that the True Story and the Fictionalized Story, even taken together,[8] differ dramatically from the Miniseries in "total concept and overall feel," *see Gaito*, 602 F.3d at 66, as well as in elements more easily isolated, like plot, themes, and pacing. *Williams*, 84 F.3d at 589. There is simply no "plausible claim that there is a common aesthetic

---

[8] Where the allegedly infringed work is made up of separate but contiguous works, it is appropriate to treat them in the aggregate as a single work. *See Castle Rock Entm't*, 150 F.3d at 138.

appeal between" the Short Stories and the Miniseries.  *Mallery v. NBC Universal, Inc.*, No. 07

Civ. 2250(DLC), 2007 WL 4258196, at *8 (S.D.N.Y. Dec. 3, 2007) (quoting *Castle Rock*

*Entm't*, 150 F.3d at 140), *aff'd*, 331 F. App'x 821 (2d Cir. 2009).  Putting to the side the

divergence in genre and mood, the qualitative and quantitative similarities of protectible

expression are less than *de minimis.  See Castle Rock Entm't*, 150 F.3d at 139 (where "original

and secondary works are of different genres and to a lesser extent because they are

in different media," the most appropriate analysis is "the quantitative/qualitative approach").

a.  General Comparison

    The Miniseries is a dramatic horror series, with scenes of bloody violence, and a strong

sexual undercurrent.  Its focus is on Guy and Rosemary's growing relationship with a group of

Satanists, and their exploitation of Rosemary's body.  Ultimately, Rosemary is raped by Satan,

suffers through a miserable pregnancy, and eventually gives birth to his child.  Multiple, drawn-

out grotesque deaths occur on screen, with the camera lingering on the blood and gore.  There is

significant sexual content, on which the camera often lingers, including Rosemary trying to

seduce Guy, Guy trying to seduce Rosemary, Guy and Rosemary engaging in foreplay, Steven

Marcato raping Rosemary, Margaux's kissing of Rosemary and Guy on the lips, and Rosemary's

dream of Roman/Steven touching her belly in the bath.  Rosemary is isolated; her only friend is

Julie, who meets a brutal end, and her own husband betrays her.  The Miniseries' main visual

themes are violence, sex, and Satanism; underneath that, it attempts to provide social

commentary on matters like the exploitation of women's bodies, and the ways that power

corrupts.  The Miniseries unfolds chronologically and primarily centers on Rosemary's

experiences.

    The Short Stories, by contrast, are far more realist in tone and feel, with completely

different plots.  They contain no explicit murder or death, and no sex.  The True Story ends on a suspenseful, eerie note, but any violence or sinister intent is merely implied.  The Fictionalized Story is not frightening, though it appears to be meant as a mystery and leaves the reader wondering about the fate of the "Ollie" character and about the father Tracey is looking for.  Both stories contain sociopolitical commentary on the Christian church and on racial issues, and the characters have relatively positive relationships with one another.  The Short Stories are not told in a linear fashion nor from a consistent point of view; they move around in time and enter and exit different character's thoughts to provide context and backstory.  Neither story appears to include Satanism either explicitly or implicitly.

In other words, the works "'are not similar in mood [or] details' . . . and, indeed, differ in nearly every relevant way."  *Mallery*, 2007 WL 4258196, at *8, (quoting *Reyher v. Children's Television Workshop,* 533 F.2d 87, 92 (2d Cir. 1976)).  "The overall feel" of the Short Stories "is so distinct [from the Miniseries] that an ordinary observer would not regard" them as substantially similar.  *Porto v. Guirgis*, 659 F. Supp. 2d 597, 615 (S.D.N.Y. 2009); *see also Webb v. Stallone*, 555 F. App'x 31, 33 (2d Cir. 2014) (summary order) (no substantial similarity between "gunfire-riddled pure action flick" and "trickery-based true caper," where both had different plots, imagery, and types of characters); *Williams*, 84 F.3d at 589 (no substantial similarity between "high-tech horror stories with villainous characters and gruesome bloodshed" on the one hand and "adventure stories [that], although suspenseful in places, have happy endings").

b.  <u>Characters</u>

Plaintiff focuses on the fact that the Miniseries contains a pair of close female friends, one of whom is African-American and one of whom is blond and white, just as the Fictionalized Story does.  (Am. Compl., Doc. 9 at 72–73; Doc. 9-1 at 1.)  The similarities end there, although Plaintiff argues that Julie and Andrea are similar in that they like to drink, tease, and flirt, (*id.*); they are funny, (*id.* at 30–40), and are affectionate, (*id.* at 28–30).

But the concept of an interracial female friendship is not an original one, and the "age and race" of a character are unprotectable characteristics.  *Flaherty v. Filardi*, No. 03 Civ. 2167(LTS)(HBP), 2009 WL 749570, at *6 (S.D.N.Y. Mar. 20, 2009), *aff'd*, 460 F. App'x 66 (2d Cir. 2012).  By the same logic, gender is also unprotectable.  Andrea is a "basic character type,"—a blond, funny best friend who has a history with her friend's significant other—whose standard attributes do not warrant protection, even if, *arguendo*, they are shared by Julie in the Miniseries.  *See, e.g.*, *Allen*, 739 F. Supp. 2d at 659 n.137, 660 (no substantial similarity between two famous young wizards who receive formal education in wizardry and compete in year-long wizard competitions, where the depiction of allegedly infringed character was only a "general prototype"); *Hogan*, 48 F. Supp. 2d at 311–12 (no substantial similarity between two half-human, half-vampire characters with the same name and similar general appearances, where on a specific level they have different physical features and character interactions).

More to the point, "when the totality of the characters' attributes and traits are considered," Andrea and Julie are not, in fact, particularly alike.  *See Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 209 (S.D.N.Y. 2010) (internal quotation marks omitted) (no substantial similarity between two confined, single men, where one is a troubled teen who watches television, plays video games, and listens to music, and the other is a male of

indeterminate age who engages in no other pastimes).  Andrea is a wealthy Dutch Huguenot from South Africa in her mid-40s, while Julie is British and appears to be in her late twenties or early thirties.  No information about Julie's socioeconomic status is provided.  Andrea comments more than once that she does not care about others, and even Jerri observes that she is often inconsiderate.  In contrast, Julie appears to care deeply for Rosemary, urging her to see a different doctor when she sees how the pregnancy is affecting Rosemary and confronting Guy when she believes he is not protecting Rosemary's best interests.  Any similarities between Julie and Andrea are superficial, and "exist[] only at a level of abstraction too basic to permit any inference that defendant[s] wrongfully appropriated any expression of plaintiff's ideas." *Allen*, 739 F. Supp. 2d at 660 (quoting *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995)).

Any similarities between Jerri and Rosemary are also generalized and unprotectible. Neither their race nor their gender is protectable, and their personalities are strikingly different. Although Jerri is described as engaging and open, the narrator repeatedly underscores her sharpness and ability to defend herself against verbal attacks.  Rosemary has no such edge—she is naïve and trusting; for example, she does not balk at Margaux Castavet's inappropriate behavior (including instructing Rosemary on exactly when she and Guy should attempt to conceive a baby), and she succumbs repeatedly to Guy's demand that they keep seeing the Castavets' obstetrician, despite her instincts to the contrary.

c.  Other Unprotectable Elements

Plaintiff's Amended Complaint contains 110 pages of purported "resemblances," but "random similarities scattered throughout the works cannot[by themselves support a finding of substantial similarity."  *Allen*, 739 F. Supp. 2d at 663 (citation omitted).  Review of Plaintiff's

list shows that nearly every instance of similarity alleged by Plaintiff either concerns an unprotectable element, or to "an ordinary observer" would not appear to be a similarity at all. *See Gaito*, 602 F.3d at 66.

For example, Plaintiff points to the "presence of an interracial couple recently arrived in Paris"; although this element is present in the Miniseries, it is not present in either the True Story or the Fictionalized Story. The narrator of the True Story does not mention a significant other, while Jerri and Lance, in the Fictionalized Story, are both black. Plaintiff also points to the fact that Guy is a writer and professor of English at a university in Paris, but none of the characters in either Short Story possess these attributes—Jerri is described as having a teaching job, but the subject she teaches is not specified.

Plaintiff also contends the works share an African-American female character who is "obsessed with a disappearance from an apartment in Paris;" the same character investigating the disappearance of someone from a building in Paris; and the character's obsession with a photograph. (Am. Compl., Doc. 9 at 29–30.) These attributes appear alike only at a distance and only in general; upon closer examination, the disappearances at issue and the photographs are so different no ordinary or discerning observer would register them as similar. As Judge Learned Hand observed, "[u]pon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [T]here is a point in this series of abstractions where they are no longer protected." *Reyher*, 533 F.2d at 91 (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931)). This principle applies to many of the other "random similarities," *Allen*, 739 F. Supp. 2d at 663, Plaintiff cites to, including the "gray apartment," (Am. Compl., Doc. 9 at 33–43); the presence of a mysterious couple, (*id.* at 35); and various themes like fear and paranoia, (*id.* at 33, 40),

cynicism, (*id.* at 48–50, 53–54), and the past, passing of time, and fleeting nature of life, (*id.* at 54–55, 58–59), inspiration, (*id.* at 56), someone acting strangely, (*id.* at 66–67), and blocking out an unpleasant memory, (*id.* at 66–67).  None of these, even taken together, are so original or specific as to constitute protectable expressions of ideas.

Other elements Plaintiff focuses on are simply *scenes a faire* that are standard in a story about Americans in Paris:  parties with cosmopolitan guests, (*id.* at 42–46); walks through old Paris neighborhoods, (*id.* at 55–56); walking arm-in-arm,[9] (*id.*, Doc. 9-1 at 26–28); concerts and nightclubs, (*id.* at 46–47, 50–52); asking for directions and asking "*parlez-vous anglais?*," (*id.*, Doc. 9-1 at 6–10).  *See Williams*, 84 F.3d at 589 ("electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are *scenes a faire* in a story about a dinosaur zoo); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (elements such as foot chases and the morale problems of policemen are *scenes a faire* of police fiction); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) (German beer hall, the phrase "Heil Hitler," and certain German songs are *scenes a faire* about Nazi-era Germany).  Some elements are both *scenes a faire* and elements from the public domain, such as depictions of the bridges on the Seine.  *See Comput. Assocs. Int'l*, 982 F.2d at 707.  Short phrases like "since that night," (*id.*, Doc. 9 at 42–43), and "do you want to walk," (*id.*, Doc. 9-1 at 26–28), are also not protectable. *See Lewinson*, 659 F. Supp. 2d at 568.  The concept of an artist having admirers (G and the party guests watching him sing in the Short Story, and Guy being followed by his young students) is a concept that appears over and over in works about such artists.  Similarly, the concept of a cult (the secret meetings Andrea's father attends at the American Assembly in Paris in the

---

[9] Indeed, the Fictionalized Story even notes that Andrea and Jerri picked up the habit of walking arm in arm from "Parisian women decades ago."

Fictionalized Story and the Satanists in the Miniseries) is also not original.

In sum, there are *no* "protectible elements, standing alone" that meet even a *de minimis* level of similarity. *Williams*, 84 F.3d at 588 (emphasis omitted); *see also Castle Rock Entm't*, 150 F.3d at 138–39. Accordingly, I find that because the differences between the works are "so pronounced," "no reasonable jury could find that the works are substantially similar." *Hogan*, 48 F. Supp. 2d at 311.

### C.     *Remaining Defendants*

In Plaintiff's letter of September 24, 2019, she states that she did not receive Cinestar's, motion to dismiss until September 19, 2019, and would have objected by the deadline had she received it in time. (Pl.'s 9/24/19 Ltr. 3).[10] However, Cinestar's motion consisted only of a notice of motion that incorporated the arguments of the Lions Gate Defendants, and introduced no new arguments.

Because the claims relating to Defendants Cinestar and Liaison are identical to the claims against the Lions Gate Defendants, and would therefore "necessarily fail for the same reasons" detailed here, I find it appropriate to 1) grant Cinestar's motion to dismiss, and 2) to dismiss Liaison *sua sponte*. *Cintron v. Shield*, No. 18-CV-1619 (RA), 2019 WL 4194429, at *3 (S.D.N.Y. Sept. 3, 2019); *see also Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990) (affirming district court's dismissal of complaint with respect to all defendants, including one who had not appeared or moved, because the issues concerning him were "substantially the same as those concerning the other defendants, and [plaintiff] had notice and a full opportunity to make out his claim[s]").

---

[10] "Pl.'s 9/24/19 Ltr." refers to the September 24, 2019 letter from Plaintiff, docketed on September 26, 2019. (Doc. 88.)

**D.** *Dismissal With Prejudice*

Claims brought pro se typically are dismissed without prejudice to amend at least if "a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation omitted). Here, however, not only has Plaintiff amended once, but a detailed comparison of the works demonstrates that there is no amendment to the pleadings that would make the works themselves substantially similar. Accordingly, Plaintiff's claims are dismissed with prejudice.

**V.** **Conclusion**

For the foregoing reasons, the Lions Gate Defendants' motion for judgment on the pleadings and Cinestar's motion to dismiss are GRANTED. In addition, because there are no facts specific to Defendant Liaison that establish a plausible claim of infringement, Plaintiff's claim against Liaison is DISMISSED *sua sponte*.

The Clerk of Court is respectfully directed to terminate the motions at Documents 42 and 80, to enter judgment, and to close the case.

The Clerk of Court is respectfully directed to mail a copy of this Opinion & Order to the pro se Plaintiff.

SO ORDERED.

Dated: September 30, 2019
New York, New York

Vernon S. Broderick
United States District Judge